# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **LESLIE RAY TURNER,** | § | |
| **Petitioner,** | § | |
| | § | |
| **V.** | § | **A-08-CA-811-SS** |
| | § | |
| **NATHANIEL QUARTERMAN, Director,** | § | |
| **Texas Dept. of** | § | |
| **Criminal Justice-Correctional** | § | |
| **Institutions Division,** | § | |
| **Respondent.** | § | |

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

To:     The Honorable Sam Sparks, United States District Judge

The Magistrate Judge submits this Report and Recommendation to the District Court pursuant to 28 U.S.C. §636(b) and Rule 1(e) of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrates, as amended, effective December 1, 2002.

Before the Court are Petitioner's Application for Habeas Corpus under 28 U.S.C. § 2254 (Document 1) and Respondent's Answer (Document 10). Petitioner, proceeding pro se, has paid the filing fee for his application. For the reasons set forth below, the undersigned finds that Petitioner's application for writ of habeas corpus should be denied.

## STATEMENT OF THE CASE

### A.     Petitioner's Criminal History

According to Respondent, the Director has lawful and valid custody of Petitioner pursuant to a judgment and sentence of the 33rd Judicial District Court of San Saba County, Texas, in cause number 5408, styled The State of Texas v. Leslie Ray Turner. On October 20, 2004, a jury found

Petitioner guilty of capital murder. As the State was not seeking the death penalty, Petitioner was sentenced by the trial court to an automatic life sentence.

Petitioner's conviction was affirmed on August 11, 2006. Turner v. State, No. 03-05-00416-CR, 2006 WL 2309774 (Tex. App. – Austin 2006, pet. ref'd). His petition for discretionary review was refused on February 7, 2007. Petitioner also challenged his conviction in a state application for habeas corpus relief. Petitioner filed his application on May 2, 2008. Ex parte Turner, Appl. No. 70,260-02. The Texas Court of Criminal Appeals denied the application without written order on October 22, 2008.

**B.     Factual Background**

The factual background of this case is found in the Court of Appeals opinion and is repeated below.

Turner was indicted for the murder of Rhonda Jo Ward, who was found dead in her burning mobile home. According to trial testimony, the fire was discovered between approximately 7 and 8 a.m. on the morning of June 17, 2002. Passing motorists Michael and Sheridan Cradduck noticed smoke coming out of the roof and windows of the mobile home. They stopped, and Michael Cradduck exited their vehicle and tried to enter the home through the front door to ascertain if anyone was inside and needed help. Michael testified that the front door was unlocked and he was able to open it, but was turned back by the smoke and heat. Michael then tried the back door, which was also unlocked, and testified that he was able to go inside "four or five steps" before the smoke and heat forced him back out.

Several residents of the street where Ward lived gathered near her burning trailer and observed the fire. Cindy Bradley testified that she observed Michael Cradduck try to get in through the front door. When he was turned back, Bradley followed him around to the back door. She concurred with Michael's testimony that the back door was not locked.

Henryetta Long recounted that she was standing next to Turner and Turner's grandmother, Ireta, while they observed the fire burning. Long testified that she heard Turner say that "somebody had tried to burn her [Ward], somebody had tried to

2

strangle her and tried to burn her house." When Long was later interviewed by Texas Ranger Joey Gordon, she told Gordon that Turner had told her "that the lady had been strangled and raped." Long also testified to telling Gordon that she had seen an unidentified "Spanish kid" running from the property.

Henryetta Long's daughter, Mitzi, recounted that Turner came over to their residence and asked Mitzi what was being reported on their police scanner to "see if we knew what was going on." Mitzi testified that she saw Turner twice that morning; the second time, he had changed his clothes and "apparently had bathed or cleaned up ." Mitzi also testified to an incident in which Turner had claimed that if he ever caught his wife cheating on him, "he would put one bullet between the both of them and say that he thought he was raping her and that he was just trying to protect her."

Cody Sanderson, a fireman who also served as the department's chaplain, responded to the fire. He and another fireman entered the burning trailer through the back door and began searching the back end of the trailer for anyone inside. Sanderson recounted that most of the flames were in the front of the trailer. As the fire was brought under control, Sanderson was told that a body had been found in the bedroom, which was located at the front of the trailer adjacent to the front door. Sanderson entered the bedroom, discovered the body, and described it for the jury:

> The body was laying on the bed on-she was on her belly, back was in the bed; in other words, her feet were up at the head part, her head was at the other end. She was totally nude, and her head was wrapped up with the covers.... Right in the small of her back, there was a place about this big around that was burnt through to her backbone.

Sanderson opined that the appearance and condition of the body "indicated that there was some type of foul play involved," and that the burns on Ward's back indicated "that there was something put on her, some type of accelerant or something, and set on fire at that time."

The body was later identified as that of Rhonda Jo Ward, the occupant of the trailer. Dr. Randall Frost, the deputy chief medical examiner with the Bexar County Medical Examiner's Office, performed an autopsy. He testified that he found fractures to the neck and an absence of soot in the respiratory tract that were consistent with a strangulation death. Frost also examined Ward's genitalia and observed redness on the back area of the vagina that appeared to "represent some kind of trauma to that area" that was consistent with penetration. On cross-examination, Frost admitted that the trauma could be indicative of either sexual assault or consensual sex, but emphasized on redirect that there was no evidence of trauma in approximately 80 percent of the sexual assault cases he has examined.

Chief of Police Ray Riggs investigated the scene in the aftermath of the fire. Riggs testified that two gasoline cans were found behind the trailer and that one of the cans was not sitting upright. Riggs further testified that the dead bolt of the front door had been forced open. Janine Mather, an official with the State Fire Marshal's Office, testified that the fire was determined to be the result of arson. Mather also testified that, in her opinion, the fire was started "to conceal the crime of homicide." Riggs called in Texas Ranger Joey Gordon to assist with the investigation.

Gordon testified that he first interviewed Henryetta Long to find out information about the male that she had seen running from the property. Gordon investigated and determined who this individual was, but did not find anything that would lead him to suspect that this person was involved in the crime. Gordon went back to Long to see if she had any additional information. Long told Gordon about Turner's statements that Ward had been strangled and raped. This information "perked" Gordon's interest, because "at the point that she said she heard this, no one should have known this because we didn't know. Law enforcement didn't know it; the fire department didn't know it.... So at the time Henryetta says that Leslie Turner told her that, no one should have known anything about a strangulation or a murder or anything about any kind of rape or sexual activity of any kind."

As the investigation continued, at Gordon's direction, Riggs requested and obtained a DNA saliva sample from Turner. Gordon also decided to interview Turner. Gordon testified that Turner told him that he knew Ward was having a relationship with a man named Scotty Peel. Gordon investigated this, but could find no evidence to corroborate what Turner had told him and that there was nothing connecting Peel to Ward. Gordon recounted that he began to believe that Turner was lying to him.

Cassie Carrading, supervisor for the DNA lab at the Austin Police Department, tested DNA obtained at the crime scene. Carrading examined the bedding from the mattress on which Ward was found and "found some stains that had the appearance of semen." Carrading tested the bedding to confirm the presence of semen, and the testing revealed a DNA profile that matched that of Leslie Turner and that did not match that of any other suspect in the case. Carrading also tested a nightgown that was found near Ward's body. Carrading testified that there were four semen stains on the nightgown, and that testing again revealed a DNA profile consistent with that of Leslie Turner. Carrading further testified that Turner's DNA was found on one of the gasoline cans. On cross-examination, Carrading admitted that DNA from an unknown person was found underneath one of Ward's fingernails. Carrading explained on redirect that this was not unusual because "your hands come in contact with so many different things."

Turner's wife Lydia testified that Turner spent the entire night before the fire in bed with her. Turner also testified, explaining the presence of his DNA around Ward as the product of a surreptitious sexual affair between the two that he revealed for the first time when on the stand. He stated that he knew Ward and had done yard work for her, and had developed a sexual relationship with her. Turner was 31; Ward was 54. When asked if Ward had a problem with the age difference, Turner replied, "No. It wasn't-it wasn't a love relationship or nothing like that. It was strictly on sex." Turner testified that the last time they had sex was the day before the fire. Turner explained:

> I was at home cooking. Lydia and them was at work. Kids were all-I was at home getting the barbecue ready to barbecue, and she [Ward] drove by, honked her horn and asked me if I wanted to come down. Well, I was going to let the coals turn into coals, so I got in her vehicle and rode down to her house.

Turner went on to testify that once they arrived at Ward's house they "performed oral sex on each other." When asked why he had not informed Ranger Gordon of his sexual relationship with Ward, Turner replied, "Because this is San Saba. You don't say nothing like that to nobody." Turner also denied making statements regarding how Ward died to Henryetta Long, claiming Long was lying. Turner said, "I'm guilty of having sex with her, and I'm guilty of lying to Joey [Gordon] about having sex with her," but he denied killing her.

Evidently rejecting Turner's explanation, the jury convicted him of murdering Ward during the course of committing or attempting to commit aggravated sexual assault or burglary of a habitation. The district court assessed punishment at life imprisonment.

Turner v. State, No. 03-05-00416-CR, 2006 WL 2309774 at *1-3 (Tex. App. – Austin 2006, pet. ref'd).

## C.    Petitioner's Grounds for Relief

Petitioner raises the following grounds for relief:

1.    The evidence was insufficient to support the conviction for capital murder;

2.    The trial court erred when it failed to conduct a hearing to determine if the retired/visiting judge could preside due to his failure to take a recent oath of office;

5

3. The prosecutor suppressed exculpatory evidence in violation of <u>Brady v. Maryland</u>, in the following instances:

    a. The original location of the victim's nightgown and the person who discovered it;

    b. The black panties collected by the DPS crime lab team and all photographs taken of and DNA tests performed on the panties;

    c. The victim's black robe, all photographs taken of it, the DNA test results, the location and time found, and the person who found it;

    d. The footprint cast molds taken by the DPS crime lab team;

4. Trial counsel was ineffective in that counsel:

    a. failed to object to a trial before the trial judge, a visiting and retired judge, because he had not recently taken an oath of office as required by the Texas Constitution;

    b. failed to object to autopsy photographs;

    c. failed to object to the trial court allowing the prosecutor to make references to God and urge the jury during closing arguments to base their verdict on divine retribution;

    d. relied on the state's subpoenas instead of filing his own;

    e. failed to interview and subpoena Johnnie Shahan who could have refuted Ranger, Chief Riggs, and Fire Marshall Mather's testimony that they discovered evidence of forced entry after returning to the crime scene eight months later;

    f. failed to interview and subpoena fireman Chris Krueger;

    g. failed to interview and subpoena Candice Portier;

    h. failed to interview and subpoena the DPS crime lab photographer;

    i. failed to interview and subpoena Tommy Joe Gage;

    j. failed to interview and subpoena Rusty White;

k.        failed to investigate and obtain a DNA test from James Edward Small;

l.        failed to interview and subpoena Daryl McClintock;

m.      failed to interview Larry Kindred, Scott Ease, Joseph Schlock and John Whitney;

n.        failed to hire a DNA expert to perform independent tests on the nightgown, robe and panties in order to determine if other suspects' DNA was on each item of evidence;

o.        failed to hire an arson expert; and

p.        failed to hire a lock expert.

**D.      Exhaustion of State Court Remedies**

Respondent contends the state court remedies have not been exhausted with respect to claims 4(h)-(k), because the right hand side of a page in Petitioner's state application for habeas corpus relief was cut off, leaving the Texas Court of Criminal Appeals to guess the missing words in the sentences. Because the Court is not provided with the original state application for habeas corpus relief, the Court is unable to determine whether Petitioner's original application was deficient. Accordingly, the Court will address the merits of Petitioner's claims.

## DISCUSSION AND ANALYSIS

**A.      The Antiterrorism and Effective Death Penalty Act of 1996**

On April 24, 1996, the President signed into law the Antiterrorism and Effective Death Penalty Act of 1996 ["AEDPA"],[1] which radically altered the standard of review by this Court in federal habeas corpus proceedings filed by state prisoners pursuant to Title 28 U.S.C. § 2254. Under the AEDPA's new standard of review, this Court cannot grant Petitioner federal habeas corpus relief

---

[1] Pub.L. No. 104-132, 110 Stat. 1214 (1996).

in this cause in connection with any claim that was adjudicated on the merits in state court proceedings unless the adjudication of that claim either (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, 28 U.S.C. § 2254(d)(1)-(2).

The "contrary to" requirement "refers to the holdings, as opposed to the dicta, of ... [the Supreme Court's] decisions as of the time of the relevant state-court decision." Dowthitt v. Johnson, 230 F.3d 733, 740 (5th Cir. 2000) (quoting (Terry) Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 1523 (2000)). The inquiry into whether the decision was based on an "unreasonable determination of the facts" constrains a federal court in its habeas review due to the deference it must accord the state court. See id.

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by ... [the Supreme Court] on a question of law or if the state court decides a case differently than ... [the Supreme Court] has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from ... [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

Id. at 740-41.

The Fifth Circuit has held that, because a federal habeas court only reviews the reasonableness of the state court's ultimate decision, the AEDPA inquiry is not altered when state habeas relief is denied without an opinion. Schaetzle v. Cockrell, 343 F.3d 440, 443 (5th Cir. 2003) (citing Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001), cert. denied, 535 U.S. 982, 122 S. Ct. 1463 (2002); Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) ("It seems clear to us

that a federal habeas court is authorized by 2254(d) to review only a state court's 'decision,' and not the written opinion explaining that decision."), <u>cert. denied</u>, 537 U.S. 1104, 123 S. Ct. 963 (2003)). With these principles in mind, this Court must now turn to the issues raised by the pleadings in this cause.

**B.      Sufficiency of the Evidence**

Federal habeas review of a claim based on the sufficiency of the evidence is extremely limited. A federal court may not disturb a conviction in a state criminal proceeding unless no rational trier of fact could have found the elements of the offense beyond a reasonable doubt. <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); <u>Gibson v. Collins</u>, 947 F.2d 780, 781 (5th Cir. 1991). The evidence must be viewed in the light most favorable to the verdict. <u>Jackson</u>, 99 S. Ct. at 2789; <u>Gibson</u>, 947 F.2d at 781. This standard of review applies in both direct and circumstantial evidence cases. <u>Schrader v. Whitley</u>, 904 F.2d 282, 287 (5th Cir. 1990).

Federal courts are bound by state statutes and case law in determining the elements of an offense. <u>Foy v. Donnelly</u>, 959 F.2d 1307, 1313 (5th Cir. 1992). Petitioner was charged with capital murder. Under Texas law, a person commits murder if he intentionally or knowingly causes the death of an individual. Murder becomes capital murder when a person commits murder in the course of certain other offenses, in this case in the course of committing or attempting to commit aggravated sexual assault or burglary of a habitation. TEX. PENAL CODE ANN. §§ 19.02(b)(1) & 19.03(a)(2) (West 2002). A person commits aggravated sexual assault if he intentionally or knowingly causes the penetration of the anus or sexual organ of another person by any means without that person's consent and if the person causes serious bodily injury or attempts to cause the death of the victim or another person in the course of the same criminal episode or uses or exhibits a deadly weapon in the

9

course of the same criminal episode. Tex. Pen. Code Ann. § 22.021(a)(1)(A)(i), (2)(A)(i) (West 2002). A person commits the offense of burglary if the person, without the effective consent of the owner, enters a building or habitation and commits or attempts to commit a felony, theft, or an assault. Tex. Pen. Code Ann. § 30.02(a)(3) (West 2002).

In reviewing Petitioner's conviction, the appellate court noted Petitioner's DNA was found in the same bed where Ward's body was found, as well as on a gas container found at the scene. Turner v. State, No. 03-05-00416-CR, 2006 WL 2309774 at *4 (Tex. App. – Austin 2006, pet. ref'd). Investigators concluded that the fire was set by arson, with the use of an accelerant, and Ward's body was partly burned as if to cover up the crime. Id. Furthermore, Henryetta Long testified that Petitioner claimed to know that Ward had been strangled. Id. The court explained this statement, coupled with Ranger Gordon's testimony that no one knew the cause of death at the time Petitioner made the statement, would enable a rational jury to infer that Petitioner was the perpetrator. Id. Viewing this evidence in the light most favorable to the verdict, the appellate court held that a rational trier of fact could have found beyond a reasonable doubt that Petitioner caused Ward's death. Id.

The appellate court also considered Petitioner's insufficiency of the evidence claim with respect to the aggravated sexual assault. Id. at 5. The court noted that Dr. Frost testified that there was redness on the back area of Ward's vagina that appeared to "represent some kind of trauma to that area." Id. While Frost did acknowledge that this evidence might be consistent with either consensual or non-consensual sex, the court concluded a rational jury could infer from all the evidence presented that the sex was not consensual. Id. Additionally, the court noted the only evidence of consensual sex between Petitioner and Ward was the defendant's own claims, first

disclosed at trial, that he had an affair with Ward.  Id.  As explained by the appellate court, the jury could have chosen to not believe Petitioner's testimony, especially in light of the fact that no other witness testified that Petitioner had a sexual or even a social relationship with Ward.  Id.  In fact, the appellate court pointed out that Ward's daughter testified that she and her mother were "very close" and that her mother had never indicated that she had been involved in any sort of romantic relationship since moving to San Saba.  Id.  Additionally, the court noted other neighbors testified that they had never seen Petitioner at Ward's trailer.  Id.  Viewing the evidence in the light most favorable to the verdict, the appellate court concluded that a rational trier of fact could have found beyond a reasonable doubt that Petitioner committed aggravated sexual assault.  Id. at 6.

Finally, the appellate court considered Petitioner's sufficiency of the evidence claim with regard to the burglary.  Id.  The court noted that Ward's daughter testified that, most of the time, her mother kept her house locked.  Id.  Michael Cradduck testified that, when he attempted to enter Ward's trailer as the fire burned, both the front and back doors were unlocked.  Id.  Janine Mather of the State Fire Marshal's Office examined the front door and testified that the "examination of the door frame revealed that the door bolt had been broken inward prior to this fire event."  Id.  The appellate court addressed Petitioner's observation that in Mather's preliminary report, Mather had stated that the "exterior examination revealed no indications of forced entry into the structure prior to the event."  Id.  The appellate court explained that Mather dismissed this inconsistency as simply an oversight during her preliminary investigation.  Id.  She explained that in her first report, the door "was just overlooked" because she "was concentrating on the origin and cause of the investigation." Id.  When Ranger Gordon notified Mather that "he wanted to get a better look at the door," she examined it more thoroughly and concluded that it had been forced open.  Id.  Additionally, the court

noted Chief of Police Riggs testified that he examined the door as part of his own investigation, and he also concluded that the deadbolt of the front door had been forced open. Id. Viewing the evidence in the light most favorable to the verdict, the appellate court concluded that a rational trier of fact could have found beyond a reasonable doubt that Petitioner committed the offense of burglary. Id.

Having independently reviewed the entire state court record, this Court finds nothing unreasonable in the state court's application of clearly established federal law or in the state court's determination of facts in light of the evidence. Accordingly, Petitioner's claim does not warrant federal habeas relief.

C.     **Trial Court Error**

Petitioner contends the trial court erred when it failed to conduct a hearing to determine if the retired/visiting judge could preside due to his failure to take a recent oath of office and whether the original judge was absent, disabled or disqualified to preside over his case.

This claim fails for several reasons. First, Petitioner's claim arises solely under state law and is, thus, not cognizable on federal habeas review. See Ramos v. Dretke, 2005 WL 39144 at *3 (N.D. Tex. Jan. 6, 2005), rec. adopted, 2005 WL 233952 (N.D. Tex. Jan. 31, 2005) (alleged failure of trial judge to take oath of office required by Texas Constitution and state law did not merit federal habeas relief). Indeed, even under state law, procedural irregularities in the referral of a matter to another judge do not render a judgment void. Davis v. State, 956 S.W.2d 555, 560 (Tex. Crim. App. 1997). Under state law, jurisdiction lies with the court itself, not the judge, as the judge is an officer of the court, he or she is not the court itself. Ex parte George, 913 S.W.2d 523, 526 (Tex. Crim. App. 1996).

Second, "a lack of filing of any required oath is not proof, in itself, of the failure of the judge to take the constitutionally required oaths." Murphy v. State, 95 S.W.3d 317, 320 (Tex. App.–Houston [1st Dist.] 2002, pet. ref'd). See also Thomas v. Burkhalter, 90 S.W.3d 425, 427 (Tex. App.–Amarillo 2002, pet. denied) (absence of oaths on file does not establish oaths were not taken). Texas courts have also declined to find the failure to file an oath that has been taken deprives an official of his authority. Espinosa v. State, 115 S.W.3d 64, 66 (Tex. App.–San Antonio 2003, no pet.); Thomas, 90 S.W.3d at 427.

Finally, Petitioner's attachments to his habeas application indicate Judge Shaver was properly administratively assigned to his trial and that the judge signed an oath of office. Pet. Exh. A and Exh. B. Thus, Petitioner has failed to show he is entitled to relief on this basis.

**D.     Prosecutorial Misconduct**

In his next ground for relief Petitioner argues the State suppressed the original location of the nightgown and the person who discovered it; the black panties, the photographs of the same and the DNA test performed on the same; the black robe, the photographs of the same, the DNA test performed on the same, the location and time the panties were panties were found, and the person who found it; and the footprint cast molds taken by the crime lab team.

A failure to disclose evidence claim is governed by Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963). Brady concerned a defendant's right to a fair trial. Oman v. Cain, 228 F.3d 616, 620 (5th Cir. 2000). To establish a Brady violation, a petitioner must prove the following: (1) the prosecutor suppressed or withheld evidence, (2) which was favorable, and (3) material to the defense. Id. at 87. However, "[m]ere conclusory statements do not raise a constitutional issue in a habeas case." Schlang v. Heard, 691 F.2d 796, 799 (5th Cir. 1982). The Fifth Circuit has specifically

held that a habeas petitioner is not entitled to relief based on conclusory and speculative allegations of a Brady violation. Murphy v. Johnson, 205 F.3d 809, 814 (5th Cir. 2000). Petitioner has not offered any support for his conclusory claim. Having independently reviewed the entire state court record, this Court finds nothing unreasonable in the state court's application of clearly established federal law or in the state court's determination of facts in light of the evidence. Accordingly, Petitioner's claim does not warrant federal habeas relief.

**E.     Ineffective Assistance of Counsel**

In his final ground for relief, Petitioner argues that he received ineffective assistance of counsel. Ineffective assistance of counsel claims are analyzed under the well-settled standard set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984):

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant can make both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

Id. at 687, 104 S. Ct. at 2064. In deciding whether counsel's performance was deficient, the Court applies a standard of objective reasonableness, keeping in mind that judicial scrutiny of counsel's performance must be highly deferential. Id. at 686-689, 104 S. Ct. 2064-65. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689, 104 S. Ct. at 2065. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that

counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. (Citation omitted). Ultimately, the focus of inquiry must be on the fundamental fairness of the proceedings whose result is being challenged. Id. at 695-97, 104 S. Ct. at 2069. Accordingly, in order to prevail on a claim of ineffective assistance of counsel, a convicted defendant must show that (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. at 687, 104 S. Ct. at 2064.

1.     <u>Oath of Office</u>

In his first claim of ineffective assistance of counsel Petitioner argues counsel failed to object to a trial before a visiting and retired judge, because he had not recently taken an oath of office as required by the Texas Constitution. As explained by Respondent, Petitioner's own proof showed the judge was properly administratively assigned to his trial and the judge signed an oath of office. Accordingly, counsel was not deficient.

2.     <u>Autopsy Photographs</u>

In his next claim for relief Petitioner argues counsel failed to urge timely objections when the trial court allowed the state to introduce irrelevant, prejudicial autopsy photographs of the decedent, which encouraged the jury to make their decision on an emotional basis. Petitioner contends that trial counsel should have objected to the photos of the victim's larynx, the photos of the victim's burned naked body, and photos of her charred eye. He also believes trial counsel should have objected to the prosecutor's presentation of the photo of the body to the jury, which was intended to evoke an emotional response from the victim's family in front of the jury.

As explained by Respondent, the photos were admissible. The photo of the larynx was introduced to prove that death was caused by strangulation. 4 SF 19-25. The photo of the eye also demonstrated side effects of a death caused by strangulation. 4 SF 18-19. The photo of the burned naked body was admitted to show res gestae evidence of an arson to cover up the murder and rape of the victim. 4 SF 11, 13, 17-18; 2 SF 153-54. These elements were all part of the State's case and were admissible as direct evidence or res gestae evidence. See Williams v. State, 176 S.W.3d 476, 481-82 (Tex. App. – Houston [1st Dist.] 2004) (autopsy photos admissible to show injuries to the body caused by the defendant); Ward v. State, 581 S.W.2d 164, 167-68 (Tex. Crim. App. 1979) (as part of the res gestae the State may prove the commission of other crimes by the defendant at the same time as the crime charged). Accordingly, counsel was not deficient.

With regard to the prosecution conspiring with the victim's family to cause an emotional outburst in front of the jury and trial counsel's failure to object, the record reflects the prosecutor did not participate in any type of misconduct, and that trial counsel did object by requesting a mistrial and later requesting a new trial. 4 SF 95-98; 5 SF 14-15, 46-47, 52-55. The trial court denied the motion for mistrial. 4 SF 16. The trial court also denied the motion for new trial after a hearing. 5 SF 64-65. Petitioner has failed to show how counsel was deficient.

3.     References to God

Next, Petitioner argues counsel was ineffective for failing to object to the prosecutor's closing statement when she made references to God and urged the jury during closing argument to base their guilt-innocence determination on divine retribution. During closing argument, the prosecutor stated:

The biggest hero is [the victim]. And her last earthly act was literally her own body, preserving. It's as if God, with that DNA, pointed his finger down, this is the man.

4 SF 155. Later she stated:

Rhonda Jo Ward, through her last earthly act, preserved the one sure thing that clicked the entire, entire justice of this case together. And it is as if the hand of God is pointing down and saying, ladies and gentlemen, this is justice, this is him.

4 SF 160.

Texas law provides that "proper jury argument must fall within one of the following categories: (1) summary of the evidence; (2) reasonable deduction from the evidence; (3) in response to argument of opposing counsel; and (4) plea for law enforcement." Borjan v. State, 787 S.W.2d 53, 55 (Tex. Crim. App. 1990) (citing Modden v. State, 721 S.W.2d 859, 862 (Tex. Crim. App. 1986); Alejandro v. State, 493 S.W.2d 230 (Tex. Crim. App. 1973)). Under this standard, the prosecutor's reference to God was improper. However, Petitioner has not shown that he was prejudiced due to his counsel's failure to object. The evidence of Petitioner's guilt is overwhelming. The two isolated comments by the prosecutor invoking God's name in the pursuit of justice could not have changed the results of the trial.

4.    Failure to Interview and Subpoena Witnesses

Petitioner raises several claims of ineffective assistance of counsel with regard to interviewing and subpoenaing witnesses. Initially, he argues counsel was ineffective for relying on the state's subpoenas instead of filing his own. However, as explained by Respondent, the trial court guaranteed trial counsel that he could rely on the presence of any witness subpoenaed by the State without filing a redundant defense subpoena for the same witness. 2 SF 80-81; 4 SF 74-75. Accordingly, Petitioner has failed to show deficient performance.

Next, Petitioner argues counsel failed to interview and subpoena Johnnie Shahan, who could have refuted Ranger, Chief Riggs, and Fire Marshall Mathers' testimony that they discovered evidence of forced entry after returning to the crime scene eight months later. Petitioner asserts Shahan was the fireman who had removed a portion of the front door frame while assisting in the removal of the victim.

Petitioner also argues counsel failed to interview and subpoena fireman Chris Krueger. Petitioner suggests Krueger could have testified that the nightgown which contained Petitioner's semen was not under the victim's body, that Chief Riggs was not the first person to enter the victim's bedroom, and that the black panties were the only clothing on the victim's body.

Petitioner further argues counsel failed to interview and subpoena Candice Portier, the DPS crime lab evidence technician, who assisted DNA supervisor Cassie Carradine in collecting the black panties from the victim's bedroom. Petitioner believes the testimony relevant because the panties, photographs of the panties or scientific test results regarding the panties were not introduced at trial.

Petitioner also asserts counsel failed to interview and subpoena (1) the DPS crime lab photographer who was the first official to enter the victim's bedroom and take photographs to assure that no evidence was moved from its original location, (2) Tommy Joe Gage, who made a written statement to officials that he had seen an Hispanic male behind the victim's home shortly before her death, and (3) Rusty White, who prepared the cast molds of the shoe prints found outside the victim's home.

Petitioner also argues counsel should have investigated and obtained a DNA test from a co-worker of the victim who was a sex offender but who had left the San Saba area over a month before

the victim's death. Petitioner suggests the unknown DNA found under the victim's nails may have matched.

Petitioner further argues counsel failed to interview and subpoena Daryl McClintock, who assisted the State Fire Marshal Janine Mathers in excavating debris from the crime scene. Petitioner contends McClintock could have refuted Mathers' testimony regarding the date she allegedly shoveled the deadbolt lock into a pile of debris. He further contends McClintock could have furnished information about the black robe.

Next, Petitioner argues counsel failed to interview Larry Kindred, Scott Ease, Joseph Schlock and John Whitney.[2] DNA of these individuals was found on a gas cap at the victim's residence. Petitioner suggests counsel should have interviewed them in order to determine whether any of them had ever seen Petitioner at the victim's residence or whether they knew of any sexual relationship between Petitioner and the victim.

In his final three uncalled witnesses claims Petitioner argues counsel failed to hire DNA, arson and lock experts to refute the State's DNA, arson and lock experts' testimony. Petitioner contends an independent DNA expert could have examined the evidence for bodily fluids, other than semen, and could have tested the black panties and robe. With respect to the arson investigator Petitioner contends the arson expert could have testified as to what the fire would have done to the nightgown had it been exposed and could have rebutted Mathers' testimony regarding fires, testimony regarding the front door frame, and Sanders' testimony regarding whether an accelerant

---

[2]The record reflects counsel called Larry Whitney as a witness, who was not allowed to testify because the basis of his testimony was hearsay. 4 SF 93-95. The Court presumes this is the witness Petitioner refers to as John Whitney.

was used. Petitioner further contends a lock expert could have rebutted Mathers' testimony regarding the locked or unlocked position of the deadbolt lock.

An attorney's failure to investigate the case against the defendant and to interview witnesses can support a finding of ineffective assistance. Bryant v. Scott, 28 F.3d 1411, 1435 (5th Cir. 1994). However, in order to establish that counsel was rendered ineffective by virtue of a failure to investigate the case against a defendant or to discover and present evidence, a convicted defendant must do more than merely allege a failure to investigate; he must state with specificity what the investigation would have revealed, what evidence would have resulted from that investigation, and how such would have altered the outcome of the case. See Anderson v. Collins, 18 F.3d 1208, 1221 (5th Cir. 1994); Nelson v. Hargett, 989 F.2d 847, 850 (5th Cir. 1993); United States v. Green, 882 F.2d 999, 1003 (5th Cir. 1989); Lockhart v. McCotter, 782 F.2d 1275, 1282-83 (5th Cir. 1986), cert. denied, 479 U.S. 1030, 107 S. Ct. 1360 (1987).

"Complaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what a witness would have testified are largely speculative." Sayre v. Anderson, 238 F.3d 631, 635-36 (5th Cir. 2001) (quoting Lockhart v. McCotter, 782 F.2d 1275, 1282 (5th Cir. 1986)). Allegations that counsel failed to investigate and develop useful evidence are not sufficient to warrant a hearing or relief absent an "affirmative showing of what the missing evidence or testimony would have been" and an explanation "why it would have been likely to make any difference in his trial or sentencing." Anderson v. Collins, 18 F.3d 1208, 1220 (5th Cir. 1994). "A prisoner's bald conclusory assertion that supposed . . . witnesses were not called does not serve to 'overcome the strong presumption that his counsel's actions were reasonable.'" Sayre, 238 F.3d at 635 (quoting Marler v. Blackburn, 777 F.2d 1007, 1010 (5th Cir. 1985)).

The Court is uncertain whether counsel interviewed those persons identified by the petitioner, because counsel was not required by the state habeas court to provide his affidavit. Nevertheless, Petitioner provides no affidavits of the uncalled witnesses he has identified and provides no evidence that the uncalled witnesses' testimony would have been favorable to his defense.[3] Petitioner's unsubstantiated allegations do not merit habeas relief. See Moore v. Quarterman, 534 F.3d 454, 468 (5th Cir. 2008) (failure to present any evidence establishing nature of missing testimony strongly argues against claim of ineffectiveness of counsel); Rector v. Johnson, 120 F.3d 551, 564 (5th Cir. 1997) (without specific affirmative showing of what missing evidence would have been court cannot determine whether habeas petitioner was prejudiced by counsel's failure to present evidence); Anderson v. Collins, 18 F.3d 1208, 1221 (5th Cir. 1994) (court cannot even begin to analyze ineffective assistance of counsel claim without affirmative showing of missing evidence or testimony). Accordingly, he has not met the Strickland standard for establishing ineffective assistance of counsel.

5.     Failure to Introduce Evidence

In his final ground of ineffective assistance of counsel Petitioner argues counsel was ineffective for failing to inspect and introduce as evidence at trial the photograph taken by Chief Riggs at the crime scene which showed the black nightgown lying on the floor in the hallway of the victim's home. Petitioner explains the nightgown was later photographed lying across the victim's leg in a body bag at the funeral home. Petitioner contends this evidence would have refuted Chief

---

[3] A statement by Tommy Joe Gage was attached to Petitioner's motion for new trial. 5 SF State's Exh. 3. Gage stated he had seen an Hispanic male walking from behind the victim's trailer house the Friday or Saturday before the fire. He did not identify the man, who did not appear to be in any hurry. In light of the overwhelming evidence of Petitioner's guilty, the failure to call Gage as a witness did not prejudice the petitioner.

Riggs and Kevin Keeney's testimony that the nightgown had not been moved from its original location. Whether the nightgown had been moved would not have altered the outcome of Petitioner's trial. Moreover, the evidence showed the nightgown had been protected by the fire by the victim's body. 3 SF 160.

Petitioner also argues counsel was ineffective for failing to investigate and introduce at trial a pair of black panties, any photographs of the panties and DNA tests taken from them. There does not appear to be any evidence that the black panties existed. A city fire marshal testified he thought he saw black panties on the victim. 4 SF 79. However, he explained he viewed the body through a window when people were processing the body for transport. 4 SF 80. Earlier testimony revealed the victim had on no clothing. 3 SF 24. Later testimony revealed the black nightgown was placed in the body bag with the victim and found between the victim's legs. 4 SF 44. Counsel cannot be faulted for failing to investigate evidence that did not exist.

Finally, Petitioner argues counsel was ineffective for failing to investigate, test and introduce at trial the black robe collected as evidence that matched the nightgown. Petitioner contends, if his DNA had been found on the robe, it could have proved he had been having a sexual relationship with the victim. As explained by Respondent, Petitioner's DNA was proven to be on the bedding and on the victim's nightgown, leaving no question of a sexual relationship. Whether there was DNA evidence on a black robe would not have changed the outcome of Petitioner's trial.

Having independently reviewed the entire state court record, this Court finds nothing unreasonable in the state court's application of clearly established federal law or in the state court's determination of facts in light of the evidence. Accordingly, Petitioner's claim that he received ineffective assistance of trial counsel is barred that 28 U.S.C. § 2254, as amended by the AEDPA.

## RECOMMENDATION

It is recommended that Petitioner's application for writ of habeas corpus be denied.

## OBJECTIONS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. Battles v. United States Parole Comm'n, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within ten (10) days after the party is served with a copy of the Report shall bar that party from de novo review by the district court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the district court. See 28 U.S.C. § 636(b)(1)(C); Thomas v. Arn, 474 U.S. 140, 150-153, 106 S. Ct. 466, 472-74 (1985); Douglass v. United Servs. Auto. Assoc., 79 F.3d 1415 (5th Cir. 1996)(en banc).

To the extent that a party has not been served by the Clerk with this Report and Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is ORDERED to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 3rd day of August, 2009.

_____

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE